UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARTIES JOHNSON, JR.,                          No. 07 CV 0320 JCW

       Petitioner,                          ORDER

   vs.

MIKE KNOWLES, et al.,

       Respondents.

_____/

     Petitioner Arties Johnson, Jr., a state prisoner proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for attempted murder and assault with great bodily injury under circumstances involving domestic violence. His application to proceed in forma pauperis has been granted. I have reviewed the petition, the respondent's answer, the traverse, and all supporting documents. I hold that Johnson is not entitled to the relief requested and order the petition denied.

1

**I.**

The following is a summary of the facts, taken from the unpublished opinion of the California Court of Appeal, Third District:

> Katherine Menefield testified that at about 1:30 a.m. on October 9, 2003, she and her friends, Rosa Elliott and defendant, pooled their resources to buy a "dime" of crack cocaine for $10 and a pipe for a dollar. After they shared the cocaine behind a Rite Aid drugstore, defendant became agitated and aggressive. He took out a butcher knife from the suitcase he was wheeling with him. Menefield saw him put Elliott in a chokehold and saw him strike her in the head, knocking her to the ground. Unable to get up, Elliott began shaking as if she was "going into some kind of fit or seizure" and urinated on herself. Defendant ordered Elliott to "'[g]et your ass up.'" He insisted there was nothing wrong with her.
>
> Menefield tried to intervene on her friend's behalf and picked up the knife when defendant dropped it. Again defendant responded, "'Ain't nothing wrong with this bitch. Get up.'" He pulled Elliott up to a standing position and dragged her into the middle of the street. He hit her, and she fell down again. Menefield screamed for help and tried to stop defendant from continuing his attack. She saw defendant stomping on Elliott's head with his foot. Her head was "busted open," and there was blood running down the drain. The upper right side of her face and head appeared to be caved in, and she had a large amount of blood and fluids coming out of her nose and mouth. Defendant grabbed his suitcase and walked away toward a local McDonald's.
>
> Two men came out of a nearby apartment complex. Menefield solicited their help. When the police arrived, Menefield was still holding the knife. She was hysterical, afraid her friend was dying. A police officer took the knife from her. Crying, she kept repeating, "'He did this to her, he did this to her.'" She identified the assailant as Art Johnson, a man Menefield had known most of her life, and provided a description of him. He was apprehended without fanfare a short distance away. Menefield identified him at a field show-up a few minutes later. He was transported to the county jail for questioning. The arresting officer testified that when he told defendant Elliott might not live, defendant insisted he did not know anything about it. Although defendant referred to Elliott as his wife and they purportedly had two children together, he never asked what happened to her, how she got hurt, or how she was doing.
>
> Meanwhile, Elliott was placed on life support. At the time of trial, she could not walk and suffered from a permanent brain injury as a result of the beating. She was found competent to testify, but she was confused, she had slurred speech, and she testified from a wheelchair. At times she addressed defendant directly and accused him of beating

2

her on different occasions. At one point she stated defendant had beaten a baby out of her. But she also claimed "Frederick Marshall" was the person responsible for her disabilities. Frederick Marshall is her son. His father, also named Frederick Marshall, had died 10 years earlier.

Defendant did not testify. His lawyer attacked Menefield's credibility. The court allowed evidence that Menefield had been homeless on and off for years and had suffered from poor mental health and substance abuse. Specifically, the court allowed the defense to introduce evidence of Menefield's convictions for a series of crimes relevant to her veracity, including petty theft, felony assaults on police officers, assault with a knife, brandishing a weapon, and resisting police, over a period of 30 years. The court did not allow the defense to introduce evidence of 14 other arrests for domestic violence, assaults, robbery, burglary, kidnapping, attempted murder, and resisting police officers.

A jury convicted defendant of attempted murder and assault with great bodily injury under circumstances involving domestic violence. The jury found the great bodily injury allegations to be true, and the court found the prior conviction allegations to be true. Defendant is serving an aggregate term of 36 years to life in state prison.

[Lodged Doc. 4 at 1-4.]

Johnson appealed to the California Court of Appeal, Third Appellate Division, which affirmed his conviction and sentence in an unpublished opinion on September 27, 2006. [Lodged Doc. 4.] On January 17, 2007, Johnson's petition for review by the California Supreme Court was denied. [Lodged Doc. 6.]

Johnson filed the present petition on February 16, 2007. On June 18, 2007, he filed a document titled "Supplemental [sic] Traverse Motion," which I construe as a supplement or addendum to his petition. Respondent's answer was filed on August 24, 2007. On September 20, 2007, Johnson filed a document titled "Opposition to Respondent[']s Reply for Writ of Habeas Corpus," which I construe as a traverse. On January 9, 2008, Johnson filed a motion to expand the record in this case; the respondents did not oppose this motion, and it was granted by Magistrate Judge Kimberly J. Mueller on May 30, 2008. On June 6, 2008,

1    Johnson filed a document titled "Traverse and Supporting Points and Authorities,"

2    which I construe as a supplement or addendum to his traverse filed on

3    September 20, 2007.  On December 9, 2008, the case was reassigned to me.

4           This petition is governed by Title 28, United States Code section 2254, as

5    amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

6    Section 2254(a) provides that a district court may entertain an application for writ

7    of habeas corpus "only on the ground that [the state prisoner] is in custody in

8    violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

9    § 2254(a).

10          To obtain federal habeas relief, Johnson must satisfy either section

11   2254(d)(1) or section 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403

12   (2000).  As amended, 28 U.S.C. § 2254 provides that:

13          (d) An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be granted
14          with respect to any claim that was adjudicated on the merits in State
            court proceedings unless the adjudication of the claim--
15
16                 (1) resulted in a decision that was contrary to, or involved an
                   unreasonable application of, clearly established Federal law, as
                   determined by the Supreme Court of the United States; or
17
18                 (2) resulted in a decision that was based on an unreasonable
                   determination of the facts in light of the evidence presented in
                   the State court proceeding.
19

20   28 U.S.C.A. § 2254.  The Supreme Court interprets section 2254(d)(1) as follows:

21          Under the "contrary to" clause, a federal habeas court may grant the
            writ if the state court arrives at a conclusion opposite to that reached
22          by this Court on a question of law or if the state court decides a case
            differently than this Court has on a set of materially indistinguishable
23          facts.  Under the "unreasonable application" clause, a federal habeas
            court may grant the writ if the state court identifies the correct
24          governing legal principle from this Court's decisions but
            unreasonably applies that principle to the facts of the prisoner's case.
25

26   *Williams*, 529 U.S. at 412-13.

                                            4

1   The deferential standard of review under AEDPA requires "that state-court

2   decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19,

3   24 (2002).  A district court generally gives deference to a state court finding of

4   fact and presumes it to be correct.  28 U.S.C. § 2254(e)(1).  Federal courts may

5   address errors of state law only if they rise to the level of a constitutional

6   violation.  *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989).  Federal

7   courts are bound by a state's interpretation of its own laws.  *Estelle v. McGuire*,

8   502 U.S. 62, 67-68 (1991); *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir.

9   2003).

10   Where, as here, there is no reasoned decision from the state's highest court,

11   the habeas court looks to the last reasoned state court decision.  *Ylst v.*

12   *Nunnemaker*, 501 U.S. 797, 801 (1991); *Van Lynn v. Farmon*, 347 F.3d 735, 738

13   (9th Cir. 2003).  If the dispositive "state court order does not furnish a basis for its

14   reasoning," a federal habeas court must conduct an independent review of the

15   record to determine whether the state court's decision is contrary to, or an

16   unreasonable application of, clearly established Supreme Court law.  *Delgado v.*

17   *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *Himes*, 336 F.3d at 853.

18   Adjudications by state intermediate appellate courts and trial courts are entitled to

19   the same AEDPA deference given to a state supreme court.  *Medley v. Runnels*,

20   506 F.3d 857, 863 (9th Cir. 2007) (en banc).  Here, the last reasoned state court

21   decision is that of the California Court of Appeal, Third Appellate District.

22   [Lodged Doc. 4.]

23                                   **II.**

24   Johnson's first argument for habeas relief is that he was denied a fair trial

25   because the trial court refused to allow him to present evidence regarding the

26   criminal history and conduct of Menefield, a key witness for the prosecution.  He

5

1   says that the jury should have been allowed to consider her criminal history

2   because it was relevant to her credibility, and also because it tended to suggest that

3   Menefield, not Johnson, committed the assault on Elliott, the victim.

4          Before trial, Johnson's counsel sought to have a number of incidents from

5   Menefield's past admitted into evidence, including "numerous arrests for crimes of

6   moral turpitude that include shootings, stabbings, drug sales, false information to

7   police officers, assaults on police officers, theft, threats to police officers, threats

8   to citizens" over a long period of time, as well as a handful of convictions that

9   were not for crimes of moral turpitude.  [Lodged Doc. 7 at 118-19, 137-39.] The

10  trial court ruled that it would allow evidence of, and questions regarding the

11  conduct underlying, most of Menefield's *convictions* involving moral turpitude,

12  but refused to allow evidence of any *arrests* that did not result in convictions,

13  stating that "they would take up an extraordinary amount of time and have little

14  probative value." [Lodged Doc. 7 at 136-37.]  Johnson's counsel acknowledged

15  that, if Menefield denied the crimes for which she had been arrested but not

16  convicted, that might add anywhere from three days to two weeks to the trial's

17  length in order to allow the jury to determine whether she was responsible for

18  those acts.  [Lodged Doc. 7 at 143.]  He argued, however, that without such

19  evidence, "the jury is going to be left with an impression that Ms. Menefield has

20  throughout the course of her 30 years of adult life been responsible for five or six

21  offenses of moral turpitude when, in fact, she's responsible for closer to 20 or 25."

22  [Lodged Doc. 7 at 144.]

23         It is clear that Menefield's testimony, and hence her credibility, were crucial

24  issues in the case.  But it is undisputed that "the trial court allowed admission of

25  30 years of [Menefield's] criminal convictions" involving moral turpitude.

26  [Lodged Doc. 4 at 6.]  The jury heard a stipulation regarding Menefield's

convictions for a number of crimes, including convictions for battery on a police officer, battery on a peace officer, threatening with a knife, resisting, delaying or obstructing a police officer, and assault with a knife. [Lodged Doc. 12 at 476; Lodged Doc. 9 at 786; *see also, e.g.,* Lodged Doc. 9 at 726, 746 and Lodged Doc. 8 at 426-34.] Moreover, it was abundantly clear to the jury that Menefield was a highly volatile and perhaps untrustworthy individual; on cross-examination about her criminal record, the jury watched as she flatly denied incidents for which she had been convicted, became increasingly agitated, "stormed out of the courtroom screaming obscenities, and then absconded." [Lodged Doc. 4 at 6-7; Lodged Doc. 8 at 426-34.] Johnson's counsel could and did make use of this ample material with which to impeach Menefield and to suggest that she was the one who injured Elliott on the night of the crime. [*See, e.g.,* Lodged Doc. 9 at 879-90 (defense closing argument attacking Menefield's credibility, reminding the jury about her history of lying and her violent attacks on others, and suggesting that Menefield had injured Elliott and blamed it on Johnson).]

I hold that, even assuming the trial court's exclusion of evidence was a constitutional error at all, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) and concluding that habeas relief was not warranted based on the trial court's exclusion of certain parts of the alleged murder victim's diary, where the trial court admitted other evidence showing that the victim was suicidal). As the California Court of Appeal pointed out, the jury "had ample opportunity to assess Menefield's credibility." [Lodged Doc. 4 at 7.] Jurors heard evidence that was similar to what Johnson sought to admit, including evidence of misconduct demonstrating "her propensity toward violence, her disdain for the police, her

1  brandishing of weapons, and her disrespect for the property of others."  [Lodged

2  Doc. 4 at 7.]  It was not contrary to or an unreasonable application of Supreme

3  Court law for the California Court of Appeal to uphold the trial court's assessment

4  that the additional excluded evidence "added little, if anything, to the damning

5  evidence" of her other convictions, would have been time-consuming and

6  cumulative of other facts already in evidence, and might well have distracted the

7  jury from the crime actually being tried.  [Lodged Doc. 4 at 7-8.]  In sum, the

8  additional evidence would not have substantially enhanced Johnson's ability to

9  impeach Menefield or advance his defense that she was Elliott's attacker.

**III.**

10

11      Johnson also seeks habeas relief on the ground that he was denied the

12  effective assistance of counsel.

13      First, Johnson states that he told his counsel prior to trial that Elliott had

14  previously accused him of beating her so severely as to cause a miscarriage.

15  Johnson also asserts that he told his counsel, prior to trial, that Elliott had never

16  been pregnant during their relationship and in fact had had a hysterectomy prior to

17  commencement of their relationship, and showed his counsel a copy of a medical

18  document that showed Elliott had had a hysterectomy.  At trial, Elliott did in fact

19  testify that at one point in their relationship, Johnson had "beat the baby out of

20  [her.]"  [Lodged Doc. 8 at 533.]  Johnson contends that his counsel was remiss in

21  failing to investigate fully the issue of Elliott's hysterectomy before trial, in failing

22  to cross-examine her at trial regarding her assertion, and in failing to impeach her

23  with the evidence of her hysterectomy.

24      Second, Johnson asserts that his counsel was ineffective because he failed to

25  retain an expert witness to assess the impact of the injuries sustained by Elliott on

26  her ability to testify at trial.  He says that expert testimony might have established

1  that she was incompetent to testify at all, and that it would also have been helpful

2  in attacking her credibility by showing the extent to which her memory and other

3  cognitive abilities were impaired.

4        To demonstrate ineffective assistance of counsel, Johnson must show (a)

5  that his counsel's performance was deficient, and (b) that the deficient

6  performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

7  To show deficient performance, he must show "that counsel made errors so serious

8  that counsel was not functioning as the 'counsel' guaranteed the defendant by the

9  Sixth Amendment." *Id.* Counsel is "presumed to have rendered adequate

10 assistance and made all significant decisions in the exercise of reasonable

11 professional judgment." *Id.* at 690. Counsel's performance must fall "outside the

12 wide range of professionally competent assistance" before it may be deemed

13 deficient. *Id.* To show prejudice, Johnson must show that his "counsel's errors

14 were so serious as to deprive the defendant of a fair trial, a trial whose result is

15 reliable." *Id.* at 687. Johnson "must show that there is a reasonable probability

16 that, but for counsel's unprofessional errors, the result of the proceeding would

17 have been different. A reasonable probability is a probability sufficient to

18 undermine confidence in the outcome." *Id.* at 694.

19       The California Court of Appeal rejected Johnson's argument that his

20 counsel had been ineffective, reasoning that Johnson "dramatically inflates the

21 impact" that evidence of Elliott's hysterectomy or expert testimony regarding her

22 mental impairments would have had. [Lodged Doc. 4 at 10.] As to the latter, the

23 state appellate court stated that "[t]here was no doubt that Elliott's memory was

24 impaired and expert testimony to reiterate the obvious would have served no

25 additional purpose." [*Id.*] As to the former, the court stated,

26

9

1
2
3
4
5
6
7
8
9

defendant insists that evidence that Elliott had undergone a hysterectomy would have minimized the harm to the defense occasioned by her claim that he had "beat the baby out of [her]." We cannot say defense counsel's failure to explore the issue was legally deficient. [citation] First, he immediately objected and asked for a mistrial. . . . [I]t is unclear whether the jurors either heard or understood the remark at all. Defense counsel may have made the tactical choice not to draw further attention to the allegation. [citation] Even if he simply overlooked the medical report, we cannot say there is a reasonable probability that evidence of the hysterectomy would have exonerated defendant. [citation] The prosecution had introduced evidence of defendant's history of domestic violence. Thus Elliott's outburst, while graphic, only added to what the jury already knew and therefore was unlikely to have impacted their ultimate decision, particularly in light of the overwhelming evidence of guilt.

10    [Lodged. Doc. 4 at 11.]

11        The California Court of Appeal correctly identified the proper standard for

12    evaluating Johnson's ineffective assistance of counsel claims. The California

13    Court of Appeal cited *People v. Jennings*, 53 Cal. 3d 334, 357 (1991), which in

14    turn discussed and applied the rule of *Strickland v. Washington*, 446 U.S. at

15    687-92. I conclude that the California Court of Appeal has not "applied *Strickland*

16    to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535

17    U.S. 685, 698-99 (2002).

18        Johnson did not show either a constitutionally deficient performance or

19    prejudice as to his counsel's handling of the issue of Elliott's alleged miscarriage.

20    There is apparently a dispute of fact as to whether Johnson's counsel was aware

21    prior to trial that Elliott might accuse Johnson of having caused her to miscarry.

22    Johnson claims he told his lawyer prior to trial that Elliott had made such

23    accusations in the past, and claims that he even pointed out to his lawyer the

24    medical record reflecting Elliott's hysterectomy [Supplemental (sic) Traverse

25    Motion at 11]; his lawyer testified that the first time he remembered learning about

26    Elliott's claimed miscarriage was at the trial. [Lodged Doc. 10 at 1025.] Even if

10

Johnson's counsel knew before trial that Elliott might make such an accusation, it did not fall "outside the wide range of professionally competent assistance" for him to decline to cross-examine Elliott about her alleged miscarriage and her hysterectomy. *Strickland*, 466 U.S. at 687. Elliott's statement that Johnson had "beat[en] the baby out of me" was stricken from the record almost immediately [Lodged Doc. 8 at 533], and Johnson's counsel subsequently moved for a mistrial on the basis of that testimony. [Lodged Doc. 8 at 563.] Once the district court refused to order a mistrial [Lodged Doc. 8 at 565], it would have been a reasonable exercise of professional judgment for Johnson's counsel to decide that cross-examining Elliott regarding her statement would not help Johnson and might even hurt his case by drawing the jury's attention back to the stricken testimony.

Moreover, even assuming that there was some error by Johnson's counsel, I conclude that it did not prejudice Johnson. As the California Court of Appeal observed, "it is unclear whether the jurors either heard or understood the remark at all," due to Elliott's unclear speech. [Lodged Doc. 4 at 11.] Even if they did hear and understand it, they were immediately instructed to disregard it. Finally, the jurors were allowed to consider other evidence of Johnson's history of domestic violence toward Elliott. There is not a "reasonable probability" that the jury's ultimate view of Johnson's guilt was impacted by evidence suggesting that on one particular occasion, he may have beaten her severely enough to cause a miscarriage, when there was a significant amount of evidence already before the jury regarding both his past violence toward Elliott and his actions on the night of the crime for which he was tried.[1]  [*See, e.g.,* Lodged Doc. 9 at 801-08

---

[1] For the same reasons, I find unpersuasive Johnson's assertion that he was denied a fair trial because the trial court denied his motion for a mistrial after

(continued...)

1   (prosecution's summary, at closing argument, of earlier instances of Johnson's

2   domestic violence toward Elliott); *see also* Lodged Doc. 8 at 533-38 (Elliott's trial

3   testimony that, prior to the crime at issue in this case, Johnson had beaten her

4   severely enough to send her to the hospital twice when she lived in Bakersfield

5   and that he beat her while she was living in a group home in Sacramento); Lodged

6   Doc. 9 at 628-31, 634-41 (trial testimony of law enforcement officers regarding

7   Johnson's abuse of Elliott on other occasions); Lodged Doc. 9 at 642-43

8   (testimony of law enforcement officer that, prior to the crime at issue in this case,

9   Elliott told an officer that Johnson hit her several times per week).]

10   Likewise, Johnson did not show a constitutionally deficient performance or

11   prejudice as to his counsel's handling of the issue of Elliott's mental capacity.

12   The record shows that no expert was needed to convey to the jury that Elliott was

13   cognitively impaired and had problems remembering events.  The California Court

14   of Appeal stated that "[h]er testimony [was] nearly incomprehensible and rarely

15   responsive. . . . [H]er speech was slurred and very difficult to understand.  To the

16   extent she could be understood, she often gave inconsistent responses . . . and she

17   obviously confused many events in her life."  [Lodged Doc. 4 at 9-10.]  Because

18   Elliott's impaired speech, cognition and memory were apparent to the jury without

19   the aid of an expert, it was not "outside the wide range of professionally

20   competent assistance" for Johnson's counsel to decide that an expert would not

21   _____

22   [1](...continued)
Elliott testified that Johnson had "beat the baby out of [her.]"  The California

23   Court of Appeal held that the trial court did not abuse its discretion in denying the
mistrial [Lodged Doc. 4 at 8-10], and that holding was neither contrary to nor an

24   unreasonable application of clearly established Supreme Court law, given that the
jurors may not have fully heard or understood Elliott's statement; the court

25   instructed them to disregard it; and they were permitted to consider other evidence
of Johnson's domestic violence toward Elliott.

26

12

1   enhance Johnson's case.  *Strickland*, 466 U.S. at 687.  For the same reasons, I hold
2   that Johnson has not shown he was prejudiced by his counsel's failure to present
3   expert testimony, because the jury had ample opportunity to draw its own
4   conclusions as to the extent of Elliott's impairments and to decide how they
5   diminished her credibility, and there is not a "reasonable probability" that an
6   expert witness on that topic would have caused the jury to render a different
7   verdict.

8                                                    **IV.**

9           As his final ground for seeking habeas relief, Johnson asserts prosecutorial
10  misconduct, based on a number of statements made by the prosecutor during
11  closing argument.  He points to her statement that "the law entitles [the jury] to, in
12  domestic violence cases to find but you're not required to, that if a defendant has a
13  disposition to commit domestic violence offenses that he's probably your guy this
14  time."  [Lodged Doc. 9 at 808.]  The trial court sustained an objection by defense
15  counsel to this statement.  [Lodged Doc. 9 at 808-09.]  The prosecutor also stated
16  that "the very evidence of prior domestic violence tells us something about
17  propensity that in this type of the crime, unlike others, means something," and that
18  "[t]his type of evidence tells us something about propensity because of the nature
19  of domestic violence relationships.  Because people who commit crimes of
20  domestic violence tend to do it over and over and over again."  [Lodged Doc. 10 at
21  911-12.]  Again, the district court sustained defense objections to those statements.
22  [Lodged Doc. 10 at 911-12.]  Johnson also points to the prosecutor's statement to
23  the jury that, in light of the fact that Johnson had abused Elliott in the past, "you
24  bet your bottom dollar he'll do it again because she's nothing to him."  [Lodged
25  Doc. 9 at 810.]

26

1   Johnson also takes issue with the prosecutor's appeal to the jury that "This

2   is your community.  This is Sacramento.  This is your city.  She [the victim Elliott]

3   is one of us."  [Lodged Doc. 9 at 813.]  The defense objected to that statement and

4   the court sustained the objection.  [Lodged Doc. 9 at 813-14.]

5   Johnson also asserts prosecutorial misconduct on the basis of statements

6   that he says show that the prosecutor expressed to the jury her personal belief or

7   opinion as to his guilt.  He points to her statement that "criminal charges are filed

8   in the State of California and signed off by the District Attorney's Office as acts

9   that violate the peace and dignity of the People of the State of California."

10   [Lodged Doc. 9 at 854.]  Johnson says this communicated to the jury that both this

11   particular prosecutor and the District Attorney's Office believed the charges were

12   true.  The district court sustained an objection by defense counsel to that comment,

13   struck the comment and told the jury to disregard it.  [Lodged Doc. 9 at 854.]

14   Johnson also states that the prosecutor told the jury, "we don't convict people on –

15   well, maybe, maybe possibly, whatever.  But Lord have mercy, if you have been

16   convinced by this evidence that he clearly is the responsible party, that's a guilty

17   vote where I come from . . .."  [Lodged Doc. 10 at 923.]  The district court also

18   sustained a defense objection to that statement and instructed the jury to disregard

19   it.  [Lodged Doc. 10 at 923-24.]

20   "In evaluating . . . allegations of prosecutorial misconduct on a writ of

21   habeas corpus, *Darden v. Wainwright* instructs us that it is not enough that the

22   prosecutors' remarks were undesirable or even universally condemned." *Tak Sun*

23   *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005), cert. denied, 546 U.S. 1110

24   (2006), citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation

25   marks and alterations omitted).  Rather, "[t]he relevant question is whether the

26   prosecutors' comments 'so infected the trial with unfairness as to make the

14

resulting conviction a denial of due process.'" *Id.* (citing *Darden*, 477 U.S. at 181). "In evaluating a petitioner's claim regarding comments by the prosecution, we have evaluated the fairness of a trial under *Darden* by considering, inter alia, '(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused.'" *Hovey v. Ayers*, 458 F.3d 892, 924 (9th Cir. 2006), *citing Tak Sun Tan*, 413 F.3d at 1115.

It was not contrary to or an unreasonable application of Supreme Court precedent for the state appellate court to conclude that the prosecutor's statements "did not, either individually or collectively, compromise the fairness of the trial." [Lodged Doc. 4 at 13.] As the state court pointed out, Johnson's counsel was vigilant during closing argument in "objecting to misstatements of the law and improper appeals to the jurors' passions," and in several instances, the court sustained the objections and/or instructed the jury to disregard the objectionable statements. [Lodged Doc. 4 at 12-13.] The jury received instructions from the court (not challenged by Johnson in this petition) as to how to consider the evidence of Johnson's prior acts of domestic violence, including instructions that "you may, but are not required to, infer that the defendant had a disposition to commit offenses involving domestic violence"; and that "[i]f you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused," but that a finding that he committed prior domestic violence "is not sufficient by itself" to support a conviction. [Lodged Doc. 12 at 494-95.] The jury was also instructed that "[s]tatements made by the attorneys during the trial are not evidence." [Lodged Doc. 12 at 489.] The jury instructions and the sustained objections helped rectify any misstatements of the law, and provided the jury with

a proper framework for evaluating the evidence of Johnson's prior acts of domestic violence.

As to the prosecutor's statements that Elliott was "one of us," it was not so egregious as to taint the fairness of the trial.  Similarly, even assuming that two of the prosecutor's statements could be read to infer that she was expressing to the jury her belief in Johnson's guilt, those statements, taken "in the context of the entire trial," were not "sufficiently prejudicial" to violate Johnson's due process rights by rendering his trial "fundamentally unfair."  *Greer v. Miller*, 483 U.S. 756, 765-67 (1987); *see also Sassounian v. Roe*, 230 F.3d 1097, 1106-07 (9th Cir. 2000) (holding that, although "prosecutor did stray beyond proper advocacy during the trial by, for example, introducing her own opinion that [a key defense witness] was a liar and implying that defense counsel had fabricated evidence," those comments, in context, did not deprive defendant of a fair trial, particularly in light of the fact that the trial court sustained several objections and properly instructed the jury that lawyers' comments and argument are not evidence).  "We presume jurors follow the court's instructions absent extraordinary situations." *Tak Sun Tan*, 413 F.3d at 1115.

## V.

Johnson, in his filings titled "Opposition to Respondent[']s Reply for Writ of Habeas Corpus" and "Notice of Motion and Motion to Expand the Record – Supplemental [sic]," suggests additional grounds for habeas relief.  He argues that his defense counsel was ineffective in failing to introduce a police investigative report regarding an interview with one of the men who allegedly called the police immediately after Elliott's injuries.  [*See* "Opposition to Respondent[']s Reply for Writ of Habeas Corpus" at 4-8.]  I understand this argument to be suggesting that the report would have helped Johnson's defense by tending to show that

1   Menefield's version of the events was untrue.  He also argues that he was
2   prevented from showing that Menefield obtained "unreported inducements and
3   deals" in exchange for her testimony at his trial.  [*See* "Notice of Motion and
4   Motion to Expand the Record – Supplemental [sic]" at 6-11.]

5       These arguments do not appear in Johnson's petition, and were raised for
6   the first time at the traverse phase of his federal habeas proceedings, after the
7   respondent's answer was filed.  "A Traverse is not the proper pleading to raise
8   additional grounds for relief."  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th
9   Cir. 1994).  Although a district court has discretion to consider a claim raised for
10  the first time in a traverse, *see Williams v. Kramer*, 2009 WL 2424582 *3 (E.D.
11  Cal.), *citing, inter alia, Jackson v. Roe*, 425 F.3d 654, 656 n.1 (9th Cir. 2005), I
12  decline to exercise that discretion to consider these claims, particularly where
13  Johnson also failed to raise these arguments in his appeal to the California Court
14  of Appeal, and thus failed to exhaust his state administrative remedies as to these
15  claims.  [*See* Lodged Docs. 1 and 3.]

16                                          **VI.**

17      In conclusion, I hold that the California Court of Appeal's decision was not
18  contrary to clearly established Supreme Court precedent; it did not "appl[y] a rule
19  that contradicts the governing law" set forth by the Supreme Court, and it did not
20  "confront[] facts that are materially indistinguishable from" a Supreme Court
21  decision and arrive at a different result than the Supreme Court.  *Williams v.*
22  *Taylor*, 529 U.S. at 405.  The California Court of Appeal's decision was also not
23  "an unreasonable application of" clearly established Supreme Court precedent;
24  this is not a case where the state court identified the correct legal rule but
25  unreasonably applied it to the facts of the case, nor did the state court
26

1  unreasonably extend or refuse to extend a legal principle to a new context. *Id.* at

2  407.  Johnson's petition for a writ of habeas corpus is denied.

3

4  DATED: April 9, 2010                    __/s/ J. Clifford Wallace_____

5                                                J. Clifford Wallace
                                                United States Circuit Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26